**In re BHC COMMUNICATIONS, INC.**
**SHAREHOLDER LITIGATION.**

**In re United Television, Inc.,**
**Shareholder Litigation.**

Nos. C.A. 18209, C.A. 18218.

Court of Chancery of Delaware,
New Castle County.

Argued:  March 14, 2001.
Decided:  June 4, 2001.

Joseph A. Rosenthal, Esquire, Morris, Rosenthal, Gross & Goddess, P.A., Pamela S. Tikellis, Esquire, Chimicles & Tikellis, Wilmington, Delaware; Judith L. Spanier, Esquire, (argued), Abbey Gardy, New York, New York; Paul J. Geller, Esquire, Howard K. Coates, Jr., Esquire, (argued), Cauley Geller Bowman & Coates, Boca Raton, Florida; Aaron L. Brody, Esquire, Stull Stull & Brody, New York, New York; Lawrence D. Levit, Esquire, Wolf Popper LLP, New York, New York; Mark A. Topaz, Esquire, Bala Cynwyd, Pennsylvania; Attorneys for Plaintiffs.

Stephen J. Rothschild, Esquire, (argued), Robert S. Saunders, Esquire, Paul J. Lockwood, Esquire, Skadden Arps Slate Meagher & Flom, Wilmington, Delaware, Attorneys for Defendants Chris–Craft Industries, Inc., Herbert J. Siegel, John C. Siegel, William D. Seigel, and Joelen K. Merkel.

Jesse A. Finkelstein, Esquire, (argued), Peter B. Ladig, Esquire, Richards, Layton & Finger, Wilmington, Delaware, Attorneys for United Television, Inc., Norman Perlmutter, James D. Hodgson, Howard F. Roycroft, and Evan C. Thompson in C.A. No. 18218.

Donald J. Wolfe, Jr., Esquire, (argued), Matthew E. Fischer, Esquire, Potter Anderson & Corroon, Jane W. Parver, Esquire, Kay, Scholer, Fierman, Hays & Handler, New York, New York, Attorneys for BHC Communications, Inc., John L. Eastman, Barry S. Greene, Laurence M. Kashdin and Morgan L. Miller, in C.A. No. 18209, and John L. Eastman in C.A. No. 18218.

## OPINION

LAMB, Vice Chancellor.

### I.

These consolidated actions arise out of a series of merger agreements between an unrelated acquirer and each of three Delaware corporations that, together, comprise a "family" of corporate entities. The plaintiffs sue as representatives of the public minority stockholders of the two subsidiary corporations. Their complaints allege claims of breach of fiduciary duty against the ultimate parent corporation and against the directors of the two subsidiary corporations who approved the merger agreements. The plaintiffs have not sought expedited proceedings or injunctive relief. Each of the merger agreements was approved at special stockholder meetings on April 24, 2001. Closing of the mergers is awaiting final regulatory approval.

■ All defendants have moved to dismiss the complaints for failure to state a claim upon which relief can be granted. Those motions cause me to inquire into the

nature of the duties owed by either the parent company or the subsidiary company directors in arranging or approving the challenged transactions and the appropriate standard by which to review the factual allegations of the complaints. Of course, it is a bedrock principle of Delaware corporate law that, where a claim for breach of fiduciary duty fails to contain allegations of fact that, if true, would rebut the presumption of the business judgment rule, that claim should ordinarily be dismissed under Rule 12(b)(6). In light of the unusual situation presented by the state of the pleadings in these cases, I will conditionally deny this aspect of the motions to dismiss with leave to renew once certain limited discovery is undertaken.

The motions also cause me to consider the effect of the exculpatory provisions authorized by Section 102(b)(7) of the Delaware General Corporation Law in the certificates of incorporation of both subsidiaries on the potential monetary liability of the director defendants who are not affiliated with the parent corporation.[1] The function of those charter provisions "is to render duty of care claims [for money damages] not cognizable and to preclude plaintiffs from pressing claims of breach of fiduciary duty, absent the most basic showing (or reasonable basis to infer) that the directors' conduct was the product of bad faith, disloyalty or one of the other exceptions listed in the statute."[2] The complaints must be dismissed as to those directors because the well-pleaded allegations of the complaints and the inferences that plaintiffs seek to draw

---

[1] The director defendants affiliated with the parent company have not moved to dismiss on this ground and, so, I will not address the issue of exculpation as it relates to them. I note, however, that those directors are not alleged to have done anything in their capacity as directors other than to vote to approve

the mergers on the recommendation of the Special Committees.

[2] *In re Lukens Inc. S'holders Litig.*, Del. Ch., 757 A.2d 720, 734 (1999), *aff'd sub nom. Walker v. Lukens, Inc.*, 757 A.2d 1278 (2000) (citations omitted).

therefrom attack those directors' actions solely on duty of care grounds.

## II.

Chris–Craft Industries, Inc. is a holding company owning a majority interest in BHC Communications, Inc. ("BHC"), which corporation, in turn, owns a majority interest in United Television, Inc. ("UTV"). The minority interests in both BHC, and UTV are publicly owned. On August 14, 2000, in three separate merger agreements, News Corporation agreed to acquire Chris–Craft, BHC and UTV for a combination of cash and securities. Special Committees of independent and disinterested directors of BHC and UTV, aided by independent legal and financial advisors, recommended the transactions to their respective boards of directors, which then gave their approval.[3]

The impetus for these transactions was a 1999 Federal Communications Commission rule change permitting an entity to own up to two television stations in the same market, instead of the single station ownership previously permitted. Chris–Craft, through BHC and UTV, owned stations in a number of highly desirable markets and, immediately after the rule change took effect, several companies contacted Chris–Craft and expressed an interest in a variety of potential transactions. Chris–Craft began discussions with CBS Corporation, Viacom Inc., and News Corporation and, in September 1999, hired Allen & Company to act as its financial advisor.

In October 1999, Chris–Craft advised BHC and UTV that each should form a special committee of outside directors "to monitor developments in light of the FCC rule change and to be prepared to evaluate any possible transactions which could effect" them. Both BHC and UTV did so, although neither committee became active until some months later when Chris–Craft suggested that they prepare themselves to evaluate a possible transaction. In response to that suggestion, both Special Committees hired legal and financial advisors in May and June of 2000. Moreover, at that time, the Special Committees' charters were broadened to include receiving and evaluating the terms of any potential acquisition transaction, determining whether such transaction was fair and in the best interests of the corporation and its stockholders, and recommending to the full board of directors what action, if any, to take.

Throughout June and July 2000, Chris–Craft and Viacom representatives met and negotiated the terms of an acquisition of Chris–Craft by Viacom. By July 24, 2000, those discussions had progressed to the point that Chris–Craft contacted the Special Committees' advisors and informed them of the fact that it was in discussions with Viacom and that they should expect to be contacted by Viacom in the next few days with proposals to acquire BHC and UTV. During the week of July 24, 2000, Chris–Craft also "purportedly" told the Special Committees that they were to negotiate directly with Viacom and that Via-

---

**3.** These "facts" are taken from the allegations in C.A. No. 18209, the BHC stockholder complaint. I note that the complaint filed in the UTV litigation (C.A. No. 18218), although substantially the same as that filed in C.A. No. 18209, omits several factual allegations found in the BHC complaint. Nevertheless, both complaints base their allegations more or less entirely on the disclosures found in the same draft registration on Form F–4 filed by News Corporation. Thus, I see no reason to treat the minor editorial differences between the complaints as having any legal or analytical significance.

com expected to enter into agreements simultaneously with all three corporations.[4]

Both complaints are deliberately sketchy about what happened next with the Viacom proposal. They allege only that, between July 24 and August 10, there were contacts between the Special Committees or their advisors and Viacom and its advisors and that Viacom made proposals to acquire both BHC and UTV.[5] This lack of detail is not due to a lack of information in the draft registration statement on which they rely, but to the pleaders' evident purpose in diminishing the roles played by the Special Committees. Because it suits that purpose, both complaints do allege that, on August 3, 2000, Chris–Craft told the Special Committees that it would not approve any transaction that did not include a sale of Chris–Craft as a whole and, that, accordingly, neither Special Committee should solicit proposals to acquire the subsidiary entities by themselves.

On July 27, 2000, as discussions with Viacom were coming to a head, News Corporation communicated a proposal to acquire Chris–Craft that was significantly higher than the latest Viacom proposal. Discussions began in earnest between Chris–Craft and News Corporation over both the form and the pricing of such a transaction. On August 10, Chris–Craft told Viacom and, later that day, the Special Committees, about this superior proposal.

Viacom responded by terminating discussions with Chris–Craft and the next day told Chris–Craft's financial advisor that it would be willing to move forward with the proposed transaction only if Chris–Craft signed a merger agreement that day. Chris–Craft refused. Viacom then withdraw its proposal and made a public announcement, disclosing its termination of negotiations.

On August 11, 2000, News Corporation's financial advisors communicated proposals to acquire BHC and UTV to the Special Committees' financial advisors. The Special Committees were informed about these proposals at meetings held that same day and given copies of a draft merger agreement modeled on the one negotiated between Chris–Craft and News Corporation. According to the complaints, the financial advisors to both committees performed their due diligence on News Corporation on August 11. That day and the next, the Special Committees met with their financial advisors and sought improvements in the financial terms from News Corporation. On August 12, News Corporation rejected both requests.

Both Special Committees met on August 13 and received the opinion of their respective financial advisors that the proposed transaction was fair from a financial point of view to the stockholders of BHC and UTV, respectively, other than Chris–Craft.

---

4. This fact is alleged in the BHC complaint, although it is modified with the word "purportedly." It is omitted entirely from the UTV complaint. I note that the Form F–4, at page 50, contains a detailed description of discussions between Chris–Craft's legal and financial advisors and representatives of the Special Committees in which it was reportedly "emphasized that Chris–Craft would not participate in or interfere with their negotiations regarding the amount or form of consideration that BHC and [UTV] stockholders were to receive in a possible transaction, and that Chris–Craft viewed their negotiations as

being independent from the negotiations taking place between Chris–Craft and Viacom." The complaints also omit any discussion of the subsequent course of negotiations between the Special Committees and Viacom, which is reported on some detail at page 52 of the F–4.

5. The BHC complaint (but not the UTV complaint) also contains an allegation that Viacom's advisors gave a copy of a draft form of merger agreement to the advisors to the BHC Special Committee.

The Special Committees then recommended the transactions to their respective boards of directors, which gave their approvals the same day. The board of directors of Chris–Craft also approved the proposed merger between Chris–Craft and News Corporation on August 13. All three transactions were publicly announced the following day.

## III.

Immediately following the announcement of the proposed transactions, a number of suits were filed here by minority stockholders of both BHC and UTV, later consolidated into the two, above-captioned, actions. The substantive allegations of the original complaints were paper thin. For example, the original complaint filed in C.A. No. 18209 simply describes the announced terms of the transactions and contains only three brief paragraphs that might be said to contain substantive allegations of wrongdoing. These are, as follows:

26. The allocation of the aggregate merger consideration unfairly benefits the interests of Chris–Craft and the shareholders of Chris–Craft to the detriment of plaintiff and the BHC shareholders.

27. The individual defendants did not appoint or retain any truly independent person or entity to negotiate for or on behalf of the class to promote their best interests in the allocation of the aggregate merger consideration.

28. The individual defendants are engaged in unfair dealing to the detriment of plaintiff and the class to whom they owe the highest fiduciary duties. The allocation of the

aggregate merger consideration was not the product of true arm's-length negotiations, but rather the design and plan of defendants who have substantial conflicts of interest with the class.

Following News Corporation's filing of the previously mentioned draft registration statement with the Securities and Exchange Commission, and before the defendants moved to dismiss these patently deficient complaints, plaintiffs filed consolidated amended complaints.[6] These complaints draw heavily on the portion of that document that describes "The Background of the Mergers." In fact, both complaints contain sections captioned "Background of the Mergers" that can be mapped, paragraph by paragraph (and sometimes word for word), to disclosures found in the draft registration statement. This reliance on News Corporations' disclosure is not without limits, however, as the pleaders chose to ignore significant factual matters reported in the draft. Most importantly, they ignore much of the information disclosed therein reflecting Chris–Craft's direction to BHC and UTV that they should be responsible for negotiating price and other terms of the proposed transactions with Viacom and News Corporation and the efforts made by the Special Committees and their advisors to engage in such negotiations.

These omissions are notable because the central theory of the consolidated amended complaints is founded on the factual premise that Chris–Craft used its dominant position to exert exclusive control over the negotiations with News Corporation and used that control to unfairly allocate "the aggregate consideration News Corporation

---

6. The final registration statement has since been sent to the stockholders of BHC and UTV. No effort has been made by the plaintiffs to amend the consolidated complaints to allege any *disclosure violation in that document.*

was willing to pay for [all three] companies ... [to] favor its own shareholders at the expense of BHC's [and UTV's] minority shareholders." To buttress this allegation, the complaints make a series of attacks on the efficacy of the Special Committees,[7] although they do not challenge the independence and disinterest of the members of those committees or their advisors. They also do not allege that the Special Committees lacked the power to reject the proposals made by News Corporation or Viacom.

The complaints are in four counts. Count I is directed at all defendants and alleges that they breached their fiduciary duty to "maximize value for [BHC's and UTV's] minority shareholders in a sale of the Company." Among other things this count complains that the defendants failed to put BHC and UTV "up for auction or to conduct a reliable market check to ascertain [its] transactional value on a stand-alone basis."

Count II alleges that Chris–Craft and its "subservient directors" on the subsidiary boards owed a duty of entire fairness "in negotiating terms of the ... mergers to reflect fairly and proportionately the value of [BHC and UTV] and the value of Chris–Craft. It further alleges that this duty was breached as a result of Chris–Craft having negotiated terms that unfairly favor its stockholders at the expense of the minority stockholders of BHC and UTV. Count II does not identify these "subservient directors" and does not specify what, if any, role any of them played in the negotiation of the BHC and UTV merger agreements.

Count III alleges that the outside directors who served on the Special Committees violated their duty of care in approving the transactions on terms that are unfair to the minority stockholders. It also alleges that the other defendants aided and abetted in these breaches of duty.

Count IV alleges that the individual defendants "have failed to ascertain [BHC's and UTV's] going concern or fair value to enable them to fulfill their fiduciary duty to inform ... [the] minority shareholders fully and accurately in connection with News Corporation's acquisition ... so that the minority shareholders can determine whether or not to seek appraisal of the fair value of [BHC's and UTV's] stock if the merger with News Corporation is consummated."

## IV.

■ In passing on a motion to dismiss a complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the court is to assume the truthfulness of all well-pleaded allegations of fact in the complaint.[8] Moreover, the court may consider, for certain limited purposes, the content of documents that are integral to or are incorpo-

---

7. The complaints allege that (i) the Special Committees' mandates were initially too restricted, (ii) Chris–Craft dictated the flow of information to them, (iii) their members were not provided with contemporaneous information about the status of negotiations between Chris–Craft and potential acquirers, (iv) their members were "kept away from the negotiating table until virtually every material detail of the proposed transactions had been worked out by Chris–Craft and News Corporation," (v) the Special Committees were improperly prevented by Chris–Craft from attempting to sell BHC and UTV on a stand-alone basis, and, (vi) ultimately, Chris–Craft put the Special Committees under such intense time pressure to act that "it was impossible for the members of [those committees] to fulfill their fiduciary duty to inform themselves about News Corporation and the transaction it proposed."

8. *Grobow v. Perot*, Del.Supr., 539 A.2d 180, 187 & n. 6 (1988).

rated by reference into the complaint.[9] For example, I will take judicial notice of the exculpatory provisions of the certificates of incorporation of BHC and UTV in assessing the merits of the claims asserted against the director defendants. At the same time, I will not affirmatively assume the truth of any of the matters reported in the draft registration statement on Form F–4, other than those items that plaintiffs have alleged in their complaints, which I must assume to be true.[10]

Nevertheless, the draft registration statement has some additional potential relevancy to my decision because plaintiffs argue that they are entitled, at this stage of the case, to infer the existence of facts which are inconsistent with other "facts" reported in the draft Form F–4. Although "all facts of the pleadings and reasonable inferences to be drawn therefrom are accepted as true ... neither inferences nor conclusions of fact unsupported by allegations of specific facts ... are accepted as true."[11] That is, "[a] trial court need not blindly accept as true all allegations, nor must it draw all inferences from them in plaintiffs' favor unless they are reasonable inferences."[12] The question then is whether or not, in these consolidated actions where the complaints are

closely predicated on a draft disclosure document, it is reasonable to infer the existence of other facts which are not alleged in the complaint and which are directly at odds with other statements made in the same draft disclosure document that is not challenged as false or misleading.

## V.

I will begin by addressing the motion to dismiss by the non-Chris-Craft directors of BHC and UTV predicated on the existence of exculpatory charter provisions authorized by Section 102(b)(7) of the Delaware General Corporation Law.[13] Although not alleged in the complaint, plaintiffs concede that both BHC and UTV have charter provisions intended to exculpate directors from personal liability for monetary damages to the fullest extent permitted by law.[14]

The parties are in agreement that the motion requires me to examine the well-pleaded allegations of the complaints to determine the nature of the claims that are asserted against these directors. The function of Section 102(b)(7) provisions "is to render duty of care claims not cognizable and to preclude plaintiffs from pressing claims of breach of fiduciary

9. See In re Santa Fe Pac. Corp. S'holder Litig., Del.Supr., 669 A.2d 59, 69–70 (1995).

10. Id.

11. Grobow, 539 A.2d at 187 n. 6.

12. Id. at 187.

13. The BHC board is made up of eight persons, four of whom were also officers or directors of Chris–Craft at the relevant times. The other four are as follows: Morgan L. Miller and John L. Eastman, who have no association with Chris–Craft and who served on the BHC Special Committee, Laurence M. Kashdin and Barry S. Greene. Kashdin and Greene were formerly officers of Chris–Craft. Greene is also alleged to "serve as a consul-

tant for BHC" although the details of that consultancy are not supplied in the pleadings. The UTV board is made up of seven persons, four of whom are also officers or directors of Chris–Craft. The other three are as follows: Howard F. Roycroft and James D. Hodson, the two members of the UTV Special Committee, and John L. Eastman, who also serves on the BHC board.

14. The BHC and UTV certificates of incorporation are Exhibits A and B to the opening brief filed on behalf of the director defendants who are not affiliated with Chris–Craft. There is no issue as to their authenticity. I will take judicial notice of their terms.

duty, absent the most basic factual showing (or reasonable basis to infer) that the directors' conduct was the product of bad faith, disloyalty or one of the other exceptions listed in the statute."[15] Those complaints should be dismissed if "it appears, after careful examination of the Complaint, that 'the factual basis for [the] claim solely implicates a violation of the duty of care.'"[16]

A careful examination of the complaints and the claims asserted therein leads me ineluctably to conclude that all of the claims alleged against the non-Chris-Craft director defendants are based on allegations of breach of the duty of care.

▮ Count I alleges that the director defendants failed to "maximize value for [BHC's and UTV's] minority shareholders in a sale of the Company," and failed to "put [the companies] up for auction or conduct a reliable market check to ascertain [their] transactional value on a stand-alone basis." Without more, these allegations allege only a breach of the duty of care and fall within the protection of the Section 102(b)(7) charter provisions.[17]

▮ The complaints attempt to elaborate on these claims by alleging that "the defendants tied the sale of [BHC and UTV] to the sale of Chris-Craft, allowing Chris-Craft the opportunity to divert a disproportionate share of [their] value to Chris-Craft shareholders...." But these additional allegations are insufficient to raise any challenge to the independence or disinterestedness of the members of the Special Committees or, for that matter, of any of the non-Chris-Craft director defendants. The well-pleaded allegations of the complaints plainly show that it was Chris-Craft, not the defendant directors, that decided that it would not dispose of its interests in BHC (and, indirectly, UTV) outside the context of an overall deal involving the sale of all three corporations. Thus, the directors of the subsidiaries had no practical ability to "auction" those companies in order to ascertain their values "on a stand-alone basis."

▮ Count II is an entire fairness claim directed at Chris-Craft and its so-called "subservient directors." The complaints do not identify those persons and contain no well-pleaded allegations of fact from which I could infer that any director other than those who are officers or employees of Chris-Craft are, in any sense, "subservient" to its interests.[18] Thus, I will dismiss Count II as to all non-Chris-Craft director defendants.

▮ Count III is expressly alleged as a violation of the duty of care and, thus, must be dismissed. Count IV merely elaborates the duty of care claim by adding an allegation that the "Individual Defendants have failed to ascertain [BHC's and UTV's] going concern or fair value to enable them to fulfill their fiduciary duty to inform [the] minority shareholders fully and accurately ... so that [they] can determine whether or not to seek apprais-

---

15. *Lukens*, 757 A.2d at 734 (1999) (citations omitted).

16. *Id.* at 732–33 (quoting *Emerald Partners v. Berlin*, Del.Supr., 726 A.2d 1215, 1224 (1999)).

17. *Lukens*, 757 A.2d at 732–34; *Cooke v. Oolie*, Del.Ch., C.A. No. 11134, mem.op. at 34, Chandler, V.C. (June 23, 1997).

18. In their brief, the BHC plaintiffs argue that defendants Kashdin and Greene are not independent of Chris-Craft. The only facts alleged to support this inference are that Kashdin is a former senior officer of Chris-Craft and that Greene is employed as a consultant by BHC. These facts are plainly inadequate to raise any question about the independence of either man.

al. . . ." There are no facts alleged from which I could infer that such "failure" resulted from anything other than a breach of the duty of care. On the contrary, facts alleged in the complaints show that the Special Committees hired expert financial and legal advisers, met with them often and received a fairness opinion in connection with their deliberations about the News Corporation proposal. Therefore, the Section 102(b)(7) charter provisions also require that I dismiss Count IV as to the non-Chris-Craft directors.

## VI.

■■■■■■ I now turn to the merits-related motions. Generally speaking, the motions to dismiss must be denied unless I am able "to determine with 'reasonable certainty' that [the] plaintiff[s] could prevail on no set of facts that can be inferred from the pleadings."[19] Thus, the question I must consider is what set of facts can be inferred from the pleadings that would support any of the claims alleged in the complaint. Of course, in conducting this analysis, I will accept as true the well-pleaded allegations of the complaints and will draw all reasonable inferences therefrom in favor of plaintiffs.[20]

I begin with the observation that Chris–Craft could agree to merge with or to sell its control block of BHC shares to a third-party acquirer at a price that reflected a "control premium" for its controlling interest in BHC and its indirect control of UTV without necessarily implicating any fiduciary duties owed to the minority stockholders of BHC or UTV.[21] Thus, the mere fact that Chris–Craft's stockholders are to receive merger consideration reflecting a control premium not shared with the stockholders of BHC and UTV does not support an inference of breach of fiduciary duty.

■■■■■■ Similarly, while a sale of BHC to a third-party acquirer would implicate fiduciary duties owed to the minority of BHC, the standard of review of a board's decision to approve such an arm's-length transaction would ordinarily be "business judgment."[22] The same is true of a stand-alone sale of UTV. Moreover, the fact that Chris–Craft, in its role as ultimate parent corporation, proposed such a transaction or conducted the preliminary negotiations with the acquirer could not ordinarily support a claim of breach of fiduciary duty against it unless there were well-pleaded allegations that it had an interest in the transaction that differed from that of the other stockholders and exercised its control over the approval of the transaction.[23]

19. *Solomon v. Pathe Communications Corp.,* Del.Supr., 672 A.2d 35, 38 (1996) (citing *In re USACafes, L.P. Litig.,* Del.Ch., 600 A.2d 43, 47 (1991)).

20. *In re Tri–Star Pictures, Inc., Litig.,* Del. Supr., 634 A.2d 319, 326 (1993).

21. As Chancellor Allen wrote in *Mendel v. Carroll,* Del.Ch., 651 A.2d 297, 305 (1994) (citations omitted): "The law has acknowledged, albeit in a guarded and complex way, the legitimacy of the acceptance by controlling shareholders of a control premium." *See also Polk v. Good,* Del.Supr., 507 A.2d 531, 537 (1986).

22. *Smith v. Van Gorkom,* Del.Supr., 488 A.2d 858, 872 (1985) ("The rule itself is a presumption that in making a business decision, the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. . . . Thus, the party attacking a board decision as uninformed must rebut the presumption that its business judgment was an informed one.") (citation omitted).

23. *McMullin v. Beran,* Del.Supr., 765 A.2d 910, 924 (2000) ("We agree that the [subsidiary board of directors] could properly rely on the majority shareholder to conduct preliminary negotiations.").

On the contrary, if Chris–Craft's interest in the transaction was aligned with the other stockholders, a court would reasonably take its support of the proposed transaction as a strong confirmation that the business judgment rule standard of review should apply.

Plaintiffs advance several reasons why, they say, the business judgment rule does not apply. First, they argue that "[v]iewing News' proposed acquisition of Chris–Craft, BHC and UTV as a unitary transaction,[24] plaintiffs have sufficiently alleged that Chris–Craft and its designees on the [BHC and UTV] board[s] were 'interested,' and their interests were directly contrary to the interests of [the] minority shareholders."[25] Second, they argue that Chris–Craft engaged in self-dealing in connection with the BHC and UTV transactions, *i.e.*, that by virtue of its domination of BHC and UTV, it caused them to approve transactions on terms that gave Chris–Craft something of value "to the exclusion of, and detriment to, the minority stockholders of the subsidiaries."[26]

To support their claim of self-dealing, plaintiffs argue that, since the total amount News Corporation was willing to pay "was not unlimited," "the more Chris–Craft shareholders would receive necessar-

ily and adversely impacted on the consideration News was willing to pay to [the] minority shareholders." They also assert that "Chris–Craft negotiated for both its shareholders and [BHC's and UTV's] minority shareholders." Plaintiffs elaborate that Chris–Craft "agreed to the terms" of the deals for BHC and UTV before News Corporation made its offers to the Special Committees, that the Special Committees merely gave their "rubber stamp" approval, that those committees had no real bargaining power and quickly surrendered in the absence of any meaningful negotiation as to price.

The fact that the "premium" News Corporation is paying for Chris–Craft is bigger than that being paid for either BHC or UTV does not, alone, support any inference of wrongdoing. Nevertheless, there is little doubt that, if the series of charges made by plaintiffs in their briefs is supported by well-pleaded fact or by reasonable inference to be drawn therefrom, I should deny the motions to dismiss, as I could not determine with a reasonable certainty that plaintiffs could not prevail on their claims.[27] Thus, the question I must address is whether the arguments advanced by plaintiffs are supported by the well-pleaded allegations of the complaints

24. I agree that it is reasonable to infer from the well-pleaded allegations of the complaints and the terms of the merger agreements that News Corporation's willingness to acquire Chris–Craft on the terms offered for it was contingent upon its ability to acquire all three companies.

25. UTV Pls. Ans. Br. at 15. It is reasonable to infer that, once Chris–Craft had negotiated acceptable terms for its acquisition by News Corporation, Chris–Craft's "interest" in the negotiation of terms for the mergers of BHC and UTV differed from the interests of those companies' minority stockholders. This is so because it is reasonable to infer in the context of the pending motions that Chris–Craft was then more directly concerned with securing

BHC's and UTV's agreement to the terms of transactions than with the terms of those transactions. After all, Chris–Craft's stockholders will receive nothing in either of the other two mergers. I do not agree, however, that because I can infer from the facts that Chris–Craft's interest was not entirely congruent to the interests of the minority shareholders of BHC and UTV that it was "directly contrary" to those interests, as plaintiffs suggest.

26. *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971).

27. *Cf. Kahn v. Lynch Communication Sys., Inc.*, Del.Supr., 638 A.2d 1110 (1994).

or reasonable inferences to be drawn therefrom.

In the BHC complaint, the facts about the background of the proposed merger are set forth in paragraphs 21 through 53. (Paragraphs 1 to 13 describe the parties; paragraphs 14 and 15 contain the class action allegations; and paragraphs 16 through 20 describe the terms of the proposed transactions.) Nowhere in paragraphs 21 through 53 is there any allegation of fact that Chris–Craft ever discussed terms of the BHC or UTV mergers with either Viacom or News Corporation. On the contrary, every allegation of fact about Chris–Craft's negotiations with either suitor relates to the terms of a proposed acquisition of Chris–Craft. The only references to proposed price terms for BHC and UTV come in paragraphs that describe the contact and negotiations between the BHC Special Committees or its advisors and either Viacom or News Corporation (or their advisors). The structure of the UTV complaint is in all material respects the same.

Following this recitation of fact, each complaint has a series of paragraphs under the heading "The Sales Process Employed by Chris–Craft and the Individual Defendants Failed to Safeguard the Interests of [the] Minority Stockholders." Paragraph 54 in the BHC complaint (paragraph 51 in the UTC complaint) alleges the following matters:

- Chris–Craft, with the acquiescence of the Individual Defendants, assumed exclusive control of the negotiations with News Corporation.
- Chris–Craft favored its own shareholders at the expense of BHC's minority shareholders in allocating between Chris–Craft's shareholders and BHC's minority shareholders the aggregate consideration News Corporation was willing to pay for both companies.

- The negotiations for the sale of BHC were conducted exclusively by a conflicted fiduciary, Chris–Craft.

Other paragraphs in this section synthesize plaintiffs' claims that the Special Committees were ineffectual and that the participation of those committees in the process should be ignored for purposes of determining the standard of review to be applied.

It is unclear to me, from the placement of these paragraphs in the complaints, whether they are meant to allege facts or to assert the existence of reasonable inferences to be drawn from the facts previously alleged. The distinction is meaningful. In the context of these motions to dismiss, I am required to assume the truth of well-pleaded allegations of fact, but need only draw inferences that I find to be both reasonable and supported by the factual allegations of the complaints. Moreover, when reviewing pleadings and other documents for compliance with Court of Chancery Rule 11(b)(3), a court is apt to allow less latitude to those parts making allegations of fact than to those merely arguing inferences or conclusions from the facts alleged.

If I were to conclude that the matters alleged at paragraphs 54 to 65 of the BHC complaint (paragraphs 51–61 of the UTV complaint) were not alleged as fact but, instead, as inference or legal conclusion, I should grant the motions to dismiss. This is so because they are not reasonable inferences to be drawn from the well-pleaded allegations of fact found in the complaints. On the contrary, the well-pleaded allegations rather clearly support the conclusion that Chris–Craft did not negotiate the price terms of either of the other transactions and that whatever conflict Chris–Craft may have had in connection with those transactions was neutralized effectively by the creation and functioning of

the Special Committees. I emphasize, in particular, that plaintiffs make no effort at all to challenge the independence and disinterestedness of the members of the Special Committee or their advisors.

Nevertheless, I am led to conclude, from a careful reading of the complaints and briefs, that plaintiffs' counsel mean to allege as fact that Chris–Craft took "exclusive control of the negotiations with News Corporation," "allocated" the consideration to be received in the three mergers, and "dictated" the terms of those transactions. If these facts are taken as true, it follows that the complaints adequately state a claim for relief against Chris–Craft.

Although forced to this conclusion by the narrow focus of a motion under Rule 12(b)(6), I harbor serious reservations about the basis for these allegations. In particular, the complaints' highly selective (and near total) reliance on the draft registration statement filed by News Corporation is troubling. Given plaintiffs' slavish copying of large parts of that document and their apparent lack of any other source of information, I am forced to wonder whether they have a good faith basis on which to allege as fact the crucial elements of their claims that are completely at odds with other "facts" reported in the draft registration statement and carefully omitted from the complaints.

In view of these strong misgivings, I will condition the denial of the Rule 12(b)(6) motions by imposing strict control over the scope of plaintiffs' initial discovery. That discovery will be concluded no later than October 19, 2001 and will be limited to examining how News Corporation negotiated the price terms of the three merger agreements and whether Chris–Craft "dictated" or "controlled" the price terms of the BHC and UTV mergers or "allocated" the total consideration to be paid by News Corporation. Initially, written discovery

limited to this issue should be directed to Chris–Craft and its advisors and News Corporation and its advisors. When that written and documentary discovery is complete, plaintiffs will then be allowed to take the depositions of no more than four persons likely to be knowledgeable about that same issue. At the completion of this limited discovery, plaintiffs will be required to move for leave to engage in additional discovery, in default of which plaintiffs' discovery shall be deemed closed.

To implement this decision, I have today entered the attached order.